## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
CHRISTINE M. R.              :    Civ. No. 3:19CV01752(SALM)
                             :
v.                           :
                             :
ANDREW M. SAUL,              :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION               :    January 14, 2021
                             :
-----------------------------x
```

### RULING ON CROSS MOTIONS

Plaintiff Christine M. R. ("plaintiff"), brings this appeal under §205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §405(g), seeking review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner" or "defendant") denying her application for Disability Insurance Benefits ("DIB"). Plaintiff has moved to reverse the Commissioner's decision, or in the alternative, to remand for a re-hearing. [Doc. #18]. Defendant has filed a motion for an order affirming the decision of the Commissioner. [Doc. #20].

For the reasons set forth below, plaintiff's Motion to Reverse the Decision of the Commissioner [**Doc. #18**] is DENIED, and defendant's Motion for an Order Affirming the Commissioner's Decision [**Doc. #20**] is GRANTED.

1

I.  **PROCEDURAL HISTORY**[1]

Plaintiff filed an application for DIB on December 8, 2015,[2] alleging disability beginning on August 18, 2014. See Certified Transcript of the Administrative Record, Doc. #12, compiled on December 16, 2019, (hereinafter "Tr.") at 314-15. Plaintiff's application was denied initially on April 20, 2017, see Tr. 221, and upon reconsideration on June 6, 2017, see Tr. 239.

On August 30, 2018, plaintiff, represented by Attorney Paul Daddario, appeared and testified at a hearing before Administrative Law Judge ("ALJ") John Aletta. See generally Tr. 159-201. Vocational Expert ("VE") Howard Steinberg appeared and testified by telephone at the hearing. See Tr. 159, 162, 191-200, 426-27. On September 26, 2018, the ALJ issued an unfavorable decision. See Tr. 8-29. On September 16, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby making the ALJ's September 26, 2018, decision the final decision of the Commissioner. See Tr. 1-6. The case is now ripe for review under 42 U.S.C. §405(g).

---

[1] Simultaneously with her motion, plaintiff filed a Statement of Material Facts. [Doc. #18-1]. Defendant did not file a responsive Statement of Facts and instead asserts: "The Commissioner adopts Plaintiff's Statement of Facts, absent any arguments or inferences, and additionally incorporates the ALJ's decision (Tr. 8-29)." Doc. #20-1 at 2.

[2] The ALJ's decision states that plaintiff filed an application for disability benefits on November 21, 2015. See Tr. 11. This discrepancy does not affect the Court's analysis.

## II.  <u>STANDARD OF REVIEW</u>

The review of a Social Security disability determination involves two levels of inquiry. <u>First</u>, the Court must decide whether the Commissioner applied the correct legal principles in making the determination. <u>Second</u>, the Court must decide whether the determination is supported by substantial evidence. <u>See</u> <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. <u>See</u> <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. <u>See</u> <u>Norman v. Astrue</u>, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." (citing <u>Tejada v. Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999))). "Where there is a reasonable basis for doubt

3

whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (alterations added) (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983)). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing Carroll v. Sec. Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)). "Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding." Johnston v. Colvin, No. 3:13CV00073(JCH), 2014 WL 1304715, at *6 (D. Conn. Mar. 31, 2014).

In reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009)). **"[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (citations omitted).**

Finally, some of the Regulations cited in this decision, particularly those applicable to the review of medical source evidence, were amended effective March 27, 2017. Those "new regulations apply only to claims filed on or after March 27, 2017." Smith v. Comm'r, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) (summary order). Where a plaintiff's claim for benefits was filed prior to March 27, 2017, "the Court reviews the ALJ's decision under the earlier regulations[.]" Rodriguez v. Colvin, No. 3:15CV01723(DFM), 2018 WL 4204436, at *4 n.6 (D. Conn. Sept. 4, 2018); White v. Berryhill, No. 17CV04524(JS), 2018 WL 4783974, at *4 n.4 (E.D.N.Y. Sept. 30, 2018) ("'While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision under the earlier regulations because the

5

Plaintiff's application was filed before the new regulations went into effect.'" (citation omitted)).

## III. SSA LEGAL STANDARD

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1520(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities" to be considered "severe" (alterations added)).

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520. In the Second Circuit, the test is described as follows:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider [her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). If and only if the claimant does not have a listed impairment, the Commissioner engages in the fourth and fifth steps:

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Secretary then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the Secretary must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform

7

given [her] residual functional capacity." <u>Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv.</u>, 360 F. App'x 240, 243 (2d Cir. 2010) (alteration added); <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009) (<u>per curiam</u>). The residual functional capacity ("RFC") is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. <u>See</u> 20 C.F.R. §404.1545(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Bastien v. Califano</u>, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that 'the Social Security Act is a remedial statute to be broadly construed and liberally applied.'" <u>Id.</u> (quoting <u>Haberman v. Finch</u>, 418 F.2d 664, 667 (2d Cir. 1969)).

## IV.  THE DECISIONS OF THE ALJ AND THE APPEALS COUNCIL

Following the above-described evaluation process, the ALJ concluded that plaintiff "has not been under a disability, as defined in the Social Security Act, from August 18, 2014, through" September 26, 2018. Tr. 24.

At step one, the ALJ determined that plaintiff "has not
engaged in substantial gainful activity since August 18, 2014,
the alleged onset date[.]" Tr. 14.

At step two, the ALJ found that plaintiff "has the
following severe impairments: Fibromyalgia, Obesity, Asthma,
Depressive Disorder, Social Anxiety Disorder, and Anxiety
Disorder[.]" Tr. 14. The ALJ further determined that plaintiff
had "been evaluated and treated for thyroid nodules,
hypertension, and obstructive sleep apnea." Tr. 14. However, the
ALJ characterized these medically determinable impairments as
"nonsevere, in that [they] establish only a slight abnormality
or a combination of slight abnormalities that causes no more
than minimal effects on the claimant's ability to meet the basic
demands of work activity[.]" Tr. 14.

At step three, the ALJ determined that plaintiff's
impairments, either alone or in combination, did not meet or
medically equal the severity of any of the listed impairments in
20 C.F.R. Pt. 404, Subpt. P, App. 1. See Tr. 15. The ALJ
specifically "considered the claimant's impairments under
Listings 3.03 (Asthma), 12.04 (Depressive, Bipolar, and Related
Disorders), 12.06 (Anxiety and Obsessive-Compulsive Disorders),
[and] 12.15 (Trauma and Stressor Related Disorders)." Tr. 15.
The ALJ also considered plaintiff's obesity under Social

9

Security Ruling ("SSR") 02-1p and her fibromyalgia under SSR 12-2p. See Tr. 15.

Before moving on to step four, the ALJ found that plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: She can occasionally climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. The claimant can occasionally stoop, kneel, crouch and crawl. She must avoid concentrated exposure to dust, odors, fumes and pulmonary irritants. She cannot work at unprotected heights. She can tolerate occasional interaction with the public and co-workers. She can tolerate occasional changes in her work setting and work procedures, which are simple and routine in nature.

Tr. 17.

At step four, the ALJ determined that plaintiff "is unable to perform any past relevant work[.]" Tr. 22.

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" Tr. 23.

On September 16, 2019, the Appeals Council denied review of the ALJ's decision, stating: "We found no reason under our rules to review the Administrative Law Judge's decision." Tr. 1. Plaintiff submitted additional medical evidence to the Appeals Council on review. In its decision, the Appeals Council listed eight sets of medical records that plaintiff had submitted. See

Tr. 2. The Appeals Council divided this evidence into two categories: evidence it found "not material because it [was] not relevant to [plaintiff's] claim for disability[]" and evidence it found did "not relate to the period at issue." Tr. 2. Plaintiff also submitted a Mental Capacity Statement ("MCS") dated January 8, 2019, and signed by LCSW Amanda Sirignano and Dr. Lisa Diamond. See Tr. 94-97. However, the Appeals Council did not mention the MCS in its decision denying review of the ALJ's ruling. See Tr. 2.

**V.    DISCUSSION**

Plaintiff moves to reverse the decision of the Commissioner or for a remand for further proceedings. See Doc. #18. Plaintiff makes the following arguments:

1) The Appeals Council erred by failing to address the MCS. See Doc. #18-2 at 10-12.

2) The administrative record was incomplete. See id. at 1-10.

3) The ALJ erred in his evaluation of the opinion evidence. See id. at 12-13.

4) The ALJ failed to adequately evaluate plaintiff's fibromyalgia and related chronic pain. See id. at 14-20.

5) The ALJ's step five findings are not supported by substantial evidence because the RFC is not supported by substantial evidence. See id. at 20-23.

A.   The Appeals Council's Decision

Plaintiff contends that the Appeals Council erred when it denied review of plaintiff's claim without addressing the MCS submitted by plaintiff after the hearing. See Doc. #18-2 at 10. Plaintiff argues that the treating physician rule applies to the MCS, and therefore the Appeals Council's failure to address the MCS warrants remand. See id. at 10-12. The Court finds that because the MCS was submitted to the Appeals Council after the deadline for any such submissions, the Appeals Council was under no obligation to review it. Further, even if the MCS had been timely submitted, it was not entitled to treating physician deference, and any error committed by the Appeals Council in failing to discuss the MCS would have been harmless.

   1.   Applicable Law

A plaintiff may request that the Appeals Council review the ALJ's decision by filing a written request "[w]ithin 60 days after the date [plaintiff] receive[s] notice of the hearing decision or dismissal[.]" 20 C.F.R. §404.968(a)(1). A plaintiff "should submit any evidence [plaintiff] wish[es] to have considered by the Appeals Council with [plaintiff's] request for review[.]" 20 C.F.R. §404.968(a). A party

> may ask that the time for filing a request for the review
> be extended. The request for an extension of time must
> be in writing. It must be filed with the Appeals Council,
> and it must give the reasons why the request for review
> was not filed within the stated time period.

12

20 C.F.R. §404.968(b). An extension of time will be granted only if the plaintiff establishes good cause. See id.

> "The Appeals Council will review a case" if it
>
> receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. §404.970(a)(5). "New evidence is any evidence that has not been considered previously during the administrative process[,]" that is not cumulative. McIntire v. Astrue, 809 F. Supp. 2d 13, 21 (D. Conn. 2010). "Evidence is material if it is (i) relevant to the time period for which benefits have been denied and (ii) probative, meaning it provides a reasonable probability that the new evidence would have influenced the Commissioner to decide the claimant's application differently." Id. "[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

The Appeals Council is not obligated to consider evidence that is submitted untimely. See Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987) ("[T]he Appeals Council was not required by regulation to consider Milano's new psychological evidence; the report was filed after her extension had expired, rather than

with her request for review."); Schmidt v. Barnhart, 395 F.3d
737, 744 n.2 (7th Cir. 2005) ("The Appeals Council may, pursuant
to federal regulation, consider new and material evidence not
submitted to the ALJ if such evidence is forwarded to the
Council within sixty days of a claimant's receipt of the ALJ's
decision."); Sheets v. Astrue, No. 2:10CV00058, 2011 WL 1157877,
at *43 (N.D. W. Va. Mar. 9, 2011), report and recommendation
adopted, 2011 WL 1131933 (N.D. W. Va. Mar. 29, 2011) ("Because
the plaintiff did not comply with the procedures for submitting
additional evidence to the Appeals Council, the Appeals Council
had no duty to examine the additional evidence.").

> 2.   *The Appeals Council was not obligated to review
>      the MCS because it was submitted late.*

The Appeals Council denied plaintiff's request to review
the ALJ's decision on September 16, 2019. See Tr. 1. In its
denial, the Appeals Council addressed evidence that plaintiff
submitted after the ALJ's decision. See Tr. 2. The Appeals
Council wrote:

> You submitted medical evidence dated June 26, 2017 from
> Charlotte Hungerford Hospital (11 pages); medical
> evidence dated September 8, 2017 from Connecticut GI (5
> pages); medical evidence dated January 24, 2018 through
> September 21, 2018 from Community Health and Wellness (7
> pages); and medical evidence dated July 19, 2017 through
> January 31, 2018 from Pulmonary and Critical Care (15
> pages). This evidence is not material because it is not
> relevant to your claim for disability. We did not exhibit
> this evidence.

14

You submitted medical evidence dated September 28, 2018 through December 13, 2018 from Amanda Sirignano, LCSW, (4 pages); medical evidence dated September 26, 2018 through November 28, 2018 from Community Health and Wellness Center (9 pages); medical evidence dated September 27, 2018 from Connecticut GI (4 pages); and medical evidence dated September 28, 2018 through December 13, 2018 from The Charlotte Hungerford Hospital (16 pages). The Administrative Law Judge decided your case through September 26, 2018. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 26, 2018.

Tr. 2. The Appeals Council did not expressly mention the MCS, signed by LCSW Amanda Sirignano and Dr. Lisa Diamond, and dated January 8-9, 2019.[3] See Tr. 94-97.

As an initial matter, it is not entirely clear from the record when and how the Appeals Council received the MCS. Neither party argues that the Appeals Council did not receive the MCS. See Doc. #18-2 at 9 ("The document was plainly before

_____

[3] It is possible that the Appeals Council meant to refer to the MCS when it wrote that plaintiff "submitted medical evidence dated September 28, 2018 through December 13, 2018 from Amanda Sirignano, LCSW, (4 pages)[.]" The MCS is signed by LCSW Sirignano and is four pages long, see Tr. 94-97; none of the other records submitted to the Appeals Council from Charlotte Hungerford Hospital, where LCSW Sirignano is a clinician, are four pages long. See Tr. 54-69, 83-93. However, the Appeals Council included this four-page evidence in the group of evidence that does "not relate to the period at issue." Tr. 2. The MCS is based on LCSW Sirignano's treatment of plaintiff during the period at issue. See Tr. 94-97. Therefore, the Court cannot determine whether the Appeals Council meant to refer to the MCS when it referenced "medical evidence dated September 28, 2018 through December 13, 2018 from Amanda Sirignano, LCSW, (4 pages)[.]" Tr. 2.

it (R. 94-97)[.]"); Doc. #20-1 at 11. Indeed, the MCS appears in
the record among other medical evidence that was received and
discussed by the Appeals Council. See Tr. 94-97. However, there
is no indication in the record that the Appeals Council received
the MCS, such as a confirmation of receipt or a list of exhibits
that includes the MCS. Moreover, the fax stamp on the MCS
indicates only that the MCS was faxed from the provider on
January 11, 2019. See Tr. 94-97. It is unclear to whom it was
sent -- though presumably it was directed to plaintiff's counsel
-- or when it might have been received. See Tr. 94-97.
Nonetheless, the MCS is included in the administrative record,
indicating that it was received at some point.

Assuming that the Appeals Council did receive the MCS, the
record reveals that plaintiff must have submitted it late. The
ALJ issued his decision on September 26, 2018. See Tr. 8. The
first page of the ALJ's decision states: "You must file your
written appeal **within 60 days** of the date you get this notice."
Tr. 8. The decision continues, under the header "What Else You
May Send Us":

> You or your representative may send us a written
> statement about your case. You may also send us new
> evidence. You should send your written statement and any
> new evidence **with your appeal.**

Tr. 8 (emphasis in original); see also 20 C.F.R. §404.968(a)(1).

16

Allowing five days for plaintiff to receive the decision, see Tr. 8, plaintiff would have been required to submit her request for Appeals Council review, and any additional evidence she wanted the Appeals Council to consider, by November 30, 2018. See 20 C.F.R. §404.968(a)(1). Plaintiff timely filed her request for Appeals Council review on November 19, 2018. See Tr. 310-12. On November 27, 2018, the Appeals Council sent a letter to plaintiff's counsel confirming receipt of the request for review and indicating that plaintiff was required to submit any additional information that she wanted the Appeals Council to consider within 25 days, that is, on or before December 24, 2018. See Tr. 39. The Appeals Council wrote: "We will not allow more time to send information except for very good reasons." Tr. 39. On November 28, 2018, plaintiff's counsel, Benjamin Shapiro, requested an extension of time "to permit me to review the file and prepare a Statement of Reasons for Disagreement." Tr. 45.[4] Attorney Shapiro did not set forth any basis for the request, other than his "recent involvement in the matter[.]"[5] Tr. 45; see 20 C.F.R. §404.968(b) ("If you show that you had good cause for

_____

[4] The Letter did not indicate how long an extension was sought. See Tr. 45.

[5] The record indicates that plaintiff appointed Attorney Shapiro to represent her, along with Attorney Katz, on November 20, 2018. See Tr. 31.

17

missing the deadline, the time period will be extended."
(emphasis added)).

There is no evidence in the record that the Appeals Council
granted this request for an extension. To the contrary, it
appears that plaintiff submitted <u>all</u> additional evidence, other
than the MCS, within the 25-day time frame set forth in the
November 27, 2018, letter. <u>See</u> Tr. 39. Plaintiff submitted a
brief to the Appeals Council on December 24, 2018, <u>see</u> Tr. 436-
38, which would have been the last day plaintiff could submit
evidence <u>without</u> an extension of the deadline. The medical
evidence received and discussed by the Appeals Council was dated
through December 13, 2018. <u>See</u> Tr. 2. Therefore, it appears that
plaintiff's brief, and all of the evidence addressed by the
Appeals Council, were submitted on or before December 24, 2018,
that is, <u>before</u> the deadline imposed by the Appeals Council had
expired. <u>See</u> Tr. 39.

The MCS is dated January 8-9, 2019. <u>See</u> Tr. 94-97. The fax
stamp on the MCS indicates that it was faxed somewhere by the
provider on January 11, 2019. <u>See</u> Tr. 94-97. Accordingly, the
MCS had not even been <u>created</u>, and thus could not possibly have
been <u>submitted</u>, by the December 24, 2018, deadline. The MCS was
submitted late. Therefore, the Appeals Council "had no duty to
examine" the MCS. <u>Sheets</u>, 2011 WL 1157877, at *43.

> 3. *Because the treating physician rule does not*
> *apply to the MCS, the Appeals Council was not*
> *obligated to explain its treatment of it.*

Assuming that the MCS had been timely submitted, the Court next considers whether the Appeals Council erred by failing to address it. See Sullivan v. Colvin, No. 2:14CV00140(JTM), 2014 WL 4967177, at *7 (E.D. La. Oct. 3, 2014) ("Even if the court assumes that plaintiff timely submitted the LSU Bogalusa records and the Appeals Council nonetheless failed to consider them ... plaintiff was not prejudiced by the failure and a remand is not required because the evidence was not new and material, and plaintiff has not demonstrated a reasonable possibility that it would have changed the outcome.").

In denying review of an ALJ's decision, the Appeals Council is not obligated to explain the weight it assigns to any newly submitted evidence.

> The Appeals Council is only required to review the entire record, which includes any new, material evidence submitted, and to determine if any of the ALJ's determinations go against the weight of the evidence. No requirement is imposed on the Council to give a detailed description of the new medical evidence submitted or to explain its impact on the claimant's case.

Fernandez v. Apfel, No. 1:97CV07532(DGT), 1999 WL 1129056, at *3 (E.D.N.Y. Oct. 4, 1999) (footnote and citation omitted); see also Hughes v. Comm'r of Soc. Sec., No. 1:14CV00208(GWC), 2015 WL 4479565, at *4 (W.D.N.Y. July 21, 2015) ("The regulations do not require the Appeals Council to provide explicit written

findings with respect to any new evidence and its impact in light of the overall record." (citation and quotation marks omitted)).

There is one notable exception to this general rule. When the evidence submitted to the Appeals Council constitutes the opinion of plaintiff's treating physician, "the Appeals Council must give good reasons for the weight it assigns to" that opinion. Shrack v. Astrue, 608 F. Supp. 2d 297, 302 (D. Conn. 2009). Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation and quotation marks omitted). "[T]he duty imposed on the Commissioner by the regulations to explain the weight given the treating physician's opinion extends to the Appeals Council review stage[.]" McIntire, 809 F. Supp. at 13, 20; see also Oshea v. Saul, No. 3:19CV00232(SALM), 2020 WL 2374935, at *6 (D. Conn. Mar. 30, 2020) ("The law is clear that the Commissioner must, acting either through the Appeals Council or the ALJ, properly evaluate a treating physician's opinion and provide good reasons for that evaluation.").

By contrast, where "no treating or examining source's
opinion is at issue, the Appeals Council is not required to
provide an explanation for rejecting that opinion." Herod v.
Astrue, No. 1:06CV00767, 2008 WL 3155161, at *8 (W.D.N.Y. Aug.
4, 2008). While the Appeals Council "is encouraged to explain
the ... factors [listed in 20 C.F.R. §404.1527(c)(1)-(6)] in
weighing opinions from 'other' medical sources, nothing in the
regulations requires [it] to do so." Hughes, 2015 WL 4479565, at
*5. Therefore, "the Appeals Council's failure to engage with the
factors" when considering medical evidence that is not subject
to treating physician deference is not error. See id. (finding
"unpersuasive" plaintiff's argument "that the Appeals Council's
failure to engage with the factors listed above necessitates
remand").

The Court notes that, in this respect, the Appeals
Council's obligation differs starkly from that of the ALJ. The
ALJ must evaluate all medical opinions under the factors set
forth in 20 C.F.R. §404.1527(c)(1)-(6), see Poole v. Saul, 462
F. Supp. 3d 137, 150 (D. Conn. 2020), and explain the weight
assigned to each piece of evidence based on those factors. See
Conlin ex rel. N.T.C.B. v. Colvin, 111 F. Supp. 3d 376, 386
(W.D.N.Y. 2015) ("[T]he ALJ is free to decide that the opinions
of other sources are entitled to no weight or little weight,
though those decisions should be explained." (emphasis added)).

21

The Appeals Council has no such obligation. See 20 C.F.R. §404.970(a); Hughes, 2015 WL 4479565, at *4.

Therefore, the key question before the Court is whether the MCS constitutes the opinion of plaintiff's treating physician. Plaintiff argues that it does, and that the Appeals Council's failure to address the MCS in its decision means that "[r]emand ... is required." Doc. #18-2 at 10, 12. The Court agrees that if the MCS had been timely submitted, and if it constituted the opinion of plaintiff's treating physician, then the Appeals Council's failure to give any reason for omitting the MCS from its decision would warrant remand. See Oshea, 2020 WL 2374935, at *4 ("[T]he Appeals Council effectively determined that the [treating physician's opinion] was not entitled to any weight, but gave no explanation for that decision. The Court agrees that the Appeals Council failed in its obligation to provide reasons for discounting the opinion of a treating physician, and finds that remand is warranted on this basis.").

However, as explained below, the Court finds that the MCS does not constitute the opinion of plaintiff's treating physician. Accordingly, the Appeals Council had no obligation to explain the weight assigned to the MCS, and did not err by failing to address it. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (finding that the Appeals Council had no obligation

22

to explain the weight given to the opinion of a physician who was not plaintiff's treating physician).

The MCS is cosigned by Dr. Diamond and LCSW[6] Sirigano. See Tr. 97. While it is evident that Dr. Diamond is a physician, see, e.g., Tr. 69, 108, the significant question is whether Dr. Diamond is plaintiff's treating physician, so as to trigger application of the treating physician rule. See Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("[T]he opinion of a treating physician is given extra weight because of his unique position resulting from the continuity of treatment he provides and the doctor/patient relationship he develops." (citation and quotation marks omitted)). "Although there is no minimum number of visits required to establish a treating physician relationship, a physician who has examined a claimant on one or two occasions is generally not considered a treating physician." Lingley v. Saul, No. 3:19CV00682(SALM), 2020 WL 4499983, at *6 (D. Conn. Aug. 5, 2020) (quoting Burpoe v. Berryhill, No. 1:18CV03168(HBP), 2019 WL 3329818, at *18 (S.D.N.Y. July 24, 2019)); see also Cooper v. Saul, 444 F. Supp. 3d 565, 582 (S.D.N.Y. 2020) (finding two visits "insufficient, without more, to establish a treating physician relationship[]").

---

[6] LCSW stands for "Licensed Clinical Social Worker[.]" Conlin ex rel. N.T.C.B., 111 F. Supp. 3d at 386.

The record provides no indication that Dr. Diamond ever examined plaintiff. Instead, the treatment notes suggest that Dr. Diamond supervised plaintiff's treatment, but that LCSW Sirignano was the only clinician who regularly treated her. See Tr. 66-69, 105-08, 832-35, 842-45, 897-900, 920-23. Each signature by Dr. Diamond on treatment notes in the record is dated the day after LCSW Sirignano met with plaintiff. See Tr. 69, 825, 835, 845, 900, 923. Likewise, Dr. Diamond signed the MCS on January 9, 2019, the day after LCSW Sirignano signed it. See Tr. 97. Moreover, the record contains no treatment notes completed or signed only by Dr. Diamond. It appears that, rather than treating plaintiff herself, Dr. Diamond merely signed off on LCSW Sirignano's treatment notes and the MCS after they had been completed. There is simply no evidence in the record to suggest that Dr. Diamond ever met with — let alone continuously treated — plaintiff.

This lack of a treating relationship between Dr. Diamond and plaintiff means that the treating physician rule does not apply to the MCS. First, because Dr. Diamond never treated plaintiff, she is not plaintiff's treating physician. See Lingley, 2020 WL 4499983, at *6. Second, the MCS does not constitute Dr. Diamond's opinion. Where an opinion is authored by a non-physician provider and only cosigned by a physician, "but there are no records or other evidence to show that the

24

[physician] treated" the plaintiff, the opinion does not
constitute the opinion of that physician. Perez v. Colvin, No.
3:13CV00868(JCH)(HBF), 2014 WL 4852836, at *26 (D. Conn. Apr.
17, 2014), report and recommendation adopted, 2014 WL 4852848
(D. Conn. Sept. 29, 2014); see also Malave v. Berryhill, No.
3:16CV00661(SALM), 2017 WL 1080911, at *7 (D. Conn. Mar. 22,
2017) ("[B]ecause there is no evidence that [the cosigning
physician] ever treated, or otherwise saw plaintiff, the Court
finds no reversible error in the ALJ's failure to address the
significance of [the cosigning physician's] signature on" the
medical source statement.). Here, although the MCS bears Dr.
Diamond's signature, see Tr. 97, the record does not indicate
that Dr. Diamond ever treated plaintiff. Additionally, only one
person's handwriting appears on the MCS, suggesting that it was
completed by one person, and constitutes the opinion of one
person. See Tr. 94-97.

Accordingly, the treating physician rule does not apply to
the MCS, and the Appeals Council was not obligated to "give good
reasons for the weight" assigned to it. Shrack, 608 F. Supp. 2d
at 302; see also Snell, 177 F.3d at 133 (2d Cir. 1999).

> 4.   *The MCS does not alter the weight of the
>      evidence.*

The Court next considers whether the MCS "alter[s] the
weight of the evidence so dramatically as to require the Appeals

25

Council to take the case." Bushey v. Colvin, 552 F. App'x 97, 98
(2d Cir. 2014). When the Appeals Council "denies review after
considering new evidence, the court simply reviews the entire
administrative record, which includes the new evidence, and
determines, as in every case, whether there is substantial
evidence to support the decision of the Commissioner." Canady v.
Comm'r of Soc. Sec., No. 1:17CV00367(GTS)(WBC), 2017 WL 5496071,
at *10 (N.D.N.Y. Oct. 4, 2017), report and recommendation
adopted, 2017 WL 5484663 (N.D.N.Y. Nov. 14, 2017) (citation and
quotation marks omitted).

The Court has reviewed the MCS itself, treatment notes
completed by LCSW Sirignano, and the entire record, and finds
that LCSW Sirignano's opinion "does not add so much as to make
the ALJ's decision contrary to the weight of the evidence."
Rutkowski v. Astrue, 368 F. App'x 226, 229 (2d Cir. 2010).
Accordingly, remand is not warranted. See id.

The MCS form asks the provider to "rate [the] patient's
Mental abilities to function independently, appropriately,
effectively and on a sustained, consistent, useful, and routine
basis, without direct supervision or undue interruptions or
distractions – 8 hours per day, 5 days per week – in a regular,
competitive work setting for more than six consecutive months."
Tr. 94. In response, LCSW Sirignano rated almost half of the
listed mental abilities as "Category IV[,]" the most extremely

impaired designation. Tr. 94-96. A "Category IV" rating means that plaintiff's impairments would "preclude[] performance for more than 15% or more of an 8-hour work day[.]" Tr. 94. During the hearing, the VE testified that there would be no jobs in the national economy for someone with plaintiff's RFC who was "off-task 15% of the time during each eight-hour workday[.]" Tr. 197-98. Therefore, if the MCS were accepted, plaintiff would be found disabled. See Edwards v. Berryhill, No. 3:17CV00298(JCH), 2018 WL 658833, at *9 (D. Conn. Jan. 31, 2018) ("If it is true that [plaintiff] had 'Category IV' limitations in the areas specified by Dr. Feuer, that would alter the vocational analysis such that [plaintiff] would be disabled.").

The record indicates that LCSW Sirignano saw plaintiff for individual therapy sessions every two weeks beginning in February 2017. See Tr. 54-69, 99-112, 812-45, 883-923, 970-1005. The treatment notes from these visits predominantly focus on LCSW Sirignano's assistance with plaintiff's traumatic memories and offer little insight into plaintiff's functional abilities. See, e.g., 55-56, 62-63, 64-65, 99-100, 830-31. Accordingly, it appears that LCSW Sirignano's assessment of plaintiff's functional abilities in the MCS was based largely on plaintiff's own self-reports. Indeed, LCSW Sirignano expressly stated on the MCS that her answers to questions about plaintiff's functional

abilities constituted "impressions based upon history ... and symptoms [plaintiff] describes[.]" Tr. 94.

Further, the MCS is inconsistent with LCSW Sirignano's own treatment notes. While LCSW Sirignano opined in the MCS that plaintiff's ability to work was extremely restricted due to her mental abilities, the treatment notes indicate that plaintiff's anxiety and ability to interact with others had improved and were not significantly impaired. See Tr. 893-94 (September 28, 2017, treatment note: Plaintiff "present[ed] with mood improvements and a reduction in her anxiety ... she did not feel anxious in anticipation of leaving home[]" and was "taking more appropriate risks in social situations, and she is feeling empowered."); Tr. 67 (June 22, 2018, treatment note indicating that plaintiff had made progress and was "going out more often and with less accompanying dread and anxiety[]" and was "using skills to regulate anxiety"); Tr. 106 (November 1, 2018, treatment note: Plaintiff's progress showed "evidence of adaptive thoughts, strengthened insights and her presentation appears slightly less anxious.").

LCSW Sirignano's opinion in the MCS is also inconsistent with the record as a whole. See 20 C.F.R. §404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). For example, LCSW Sirignano rated plaintiff's

ability to "[m]aintain attention and concentration for extended periods of time" as "Category IV[.]" Tr. 95. However, Dr. Underhill opined that "[t]here was no evidence of impairment in attention [or] concentration," Tr. 804, and both Dr. Bangs and Dr. Fadakar agreed that plaintiff does not "have sustained concentration and persistence limitations[,]" Tr. 217, 235. Similarly, LCSW Sirignano rated plaintiff's abilities to "[i]nteract appropriately with the general public[,]" "[a]sk simple questions or request assistance[,]" and "[a]ccept instructions and respond appropriately to criticism from supervisors" as "Category IV[.]" Tr. 95. But Dr. Underhill concluded that plaintiff "appears able to relate appropriately with coworkers and supervisors." Tr. 805. Moreover, during the period in question, plaintiff lived with two roommates, attended yoga classes at the YMCA, went to the movies, and traveled to Florida and Hawaii, suggesting that her social abilities were not as limited as indicated by the MCS. See Tr. 165, 178, 180, 182-83. Finally, LCSW Sirignano opined that plaintiff's ability to understand and remember instructions would preclude performance for between five and ten percent of the work day. See Tr. 95. However, Dr. Kogan asserted that plaintiff's "[w]ork related activities involving speaking, comprehending, remembering, and carrying out instructions are not limited[,]" Tr. 810, and Dr. Underhill found that plaintiff "appears capable

of understanding and remembering moderately complex job
instructions." Tr. 805. Both Dr. Bangs and Dr. Fadakar
determined that plaintiff does not have "understanding and
memory limitations[.]" Tr. 217, 235.

In sum, the MCS is based largely upon plaintiff's
self-reports, is unsupported by LCSW Sirignano's treatment
notes, and is inconsistent with the record as a whole.
There is no "reasonable probability" that the MCS "would
have influenced the Commissioner to decide the claimant's
application differently." McIntire, 809 F. Supp. at 21; see
also Canady, 2017 WL 5496071, at *11 (remand not
appropriate where "the additional evidence submitted to the
AC would not have altered the ALJ's determination[]").
Accordingly, any error committed by the Appeals Council in
failing to discuss the late-filed MCS would have been
harmless, and does not warrant remand.

    B.   The Administrative Record

Plaintiff argues that the administrative record is
incomplete for two reasons. See Doc. #18-2 at 1-10. First,
plaintiff asserts that the Commissioner failed to develop the
administrative record because he failed to obtain any medical
source statements from plaintiff's treating physicians and
clinicians, including any records from the Susan B. Anthony
Project. See id. at 2, 10. Second, plaintiff argues that the

record is "facially incomplete" because the ALJ did not consider "additional written evidence" submitted by plaintiff just before the administrative hearing. Id. at 8.

       1.   *Development of the Record*

     "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see also Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citation and quotation marks omitted). Accordingly, the duty to develop the administrative record is triggered "only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled." Walsh v. Colvin, No. 3:13CV00687(JAM), 2016 WL 1626817, at *2 (D. Conn. Apr. 25, 2016) (citation and quotation marks omitted). "When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant, and plaintiff bears the burden of establishing such harmful error."

Parker v. Colvin, No. 3:13CV01398(CSH), 2015 WL 928299, at *12
(D. Conn. Mar. 4, 2015) (citation and quotation marks omitted).

Plaintiff argues that the Commissioner failed to develop
the record because "[t]he Record before the Court indicates no
efforts whatsoever by the ALJ to secure medical source
statements from any treating physician whatsoever." Doc. #18-2
at 4 (sic). Specifically, plaintiff claims that the record is
deficient because it "contains no medical source statement from
Dr. Richard Krinsky, from APNP Heather Platt, from Dr. Michelle
Apiado, from Dr. James O'Halloran, or from any clinician at the
Susan B. Anthony project, setting forth with specificity on a
function-by-function basis what Ms. [R.] can or cannot do." Id.
at 2. Plaintiff focuses on the fact that "[t]he Record does not
contain one shred of evidence from the Susan B. Anthony
Project," arguing that the ALJ failed to seek "medical records
or a medical source statement from the Susan B. Anthony
Project." Id. at 10. The record indicates that Dr. Krinsky, Dr.
Apiado, and APNP Platt each treated plaintiff at Charlotte
Hungerford Hospital, see, e.g., Tr. 479-80, 524, and that Dr.
O'Halloran treated plaintiff at the Community Health and
Wellness Center of Greater Torrington, see, e.g., Tr. 78.
Plaintiff attended counseling on a weekly basis at the Susan B.
Anthony Project, an organization for victims of domestic
violence. See Tr. 173.

Plaintiff's assertion that the record "indicates no efforts whatsoever by the ALJ to secure medical source statements from any treating physician whatsoever[]" is mistaken. Doc. #18-2 at 4 (sic). To the contrary, requests for medical source statements were sent to Charlotte Hungerford Hospital, the Community Health and Wellness Center of Greater Torrington, and the Susan B. Anthony Project. First, the record indicates that a letter was sent to Charlotte Hungerford Hospital on March 8, 2017, asking the Hospital to provide "a statement regarding [plaintiff's] ability to do work related activities[.]" Tr. 793. The record contains no such statement, indicating that Charlotte Hungerford did not respond. Second, a "Mental Impairment Questionnaire[,]" which includes questions about plaintiff's "functional abilities[,]" was sent to the Community Health and Wellness Center of Greater Torrington. Tr. 583-85. The Center responded with a letter stating that the questionnaire could not be completed because the "Form needs to be filled out by a specialist or Physical Therapy" and "Provider No Longer at Practice[.]" Tr. 587. Third, the Susan B. Anthony Project refused to provide <u>any</u> statement or medical records, writing in response to a request for records: "SBAP is not a clinical facility & therefore cannot provide clinical records." Tr. 158. Therefore, plaintiff's claim that medical source statements were not sought from plaintiff's treating physicians, and that no

33

records were sought from the Susan B. Anthony Project, is directly contradicted by the record. Remand is not required where, as here, the Commissioner "requested opinions from medical sources and the medical sources refused[]" to provide such opinions. Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013).

Furthermore, the Commissioner "has a duty to develop the record only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled." Walsh, 2016 WL 1626817, at *2 (citation and quotation marks omitted). Even if the Commissioner had failed to request opinions from plaintiff's treating providers, "remand is not always required when ... the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." Tankisi, 521 F. App'x at 34; see also Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (Where the consultative examiner's "medical opinion largely supported the ALJ's assessment of [plaintiff's] residual functional capacity" and "the ALJ also had all of the treatment notes from [plaintiff's] treating physicians" the ALJ had no "further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians.").

Here, the ALJ's RFC determination was based on a record containing six medical source opinions, as well as treatment notes and medical records from plaintiff's treating physicians

34

and clinicians. See Tr. 19-21. The ALJ considered the medical
opinions of four reviewing sources — Dr. Bangs, Dr. Kuslis, Dr.
Fadakar, and Dr. Ray — each of whom indicated that plaintiff
could, at a minimum, perform the RFC ultimately determined by
the ALJ. See Tr. 214-19, 232-36. The ALJ also considered the
medical opinions of two examining sources, Dr. Underhill and Dr.
Kogan. See Tr. 21. Dr. Underhill conducted a psychological
examination of plaintiff and gave the following opinion:

> Ms. [R.] appears capable of understanding and
> remembering moderately complex job instructions. She may
> have difficult maintaining concentration on job tasks.
> She appears moderately limited in her ability to handle
> ordinary job stress. She appears able to relate
> appropriately with coworkers and supervisors.

Tr. 805 (sic). Dr. Kogan conducted a physical examination of
plaintiff, concluding: "[T]here are no range of motion deficits
and no neurological deficits that limit sitting, standing,
walking, bending, lifting, carrying, reaching or finger
manipulations. The above activities are mildly limited due to
generalized musculoskeletal pain." Tr. 809.

The record also contains treatment notes and medical
records from plaintiff's treating physicians and clinicians,
including Dr. Krinsky, APNP Platt, Dr. Apiado, and LCSW
Sirignano from Charlotte Hungerford Hospital; and Dr. O'Halloran
from the Community Health and Wellness Center of Greater
Torrington. See Tr. 470-83; 488-587; 588-665; 671-76; 777-90;

930-40; 970-1005. Additionally, the record includes medical records regarding plaintiff's treatment for thyroid issues at the University of Connecticut, see Tr. 439-50; treatment records from Counseling Services of Litchfield County, see Tr. 795-99; and treatment notes from Connecticut GI, see Tr. 855-80. Accordingly, even without medical source statements from plaintiff's treating physicians, the record "contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." Tankisi, 521 F. App'x at 34. Because "there are no obvious gaps in the administrative record," the Commissioner was "under no obligation to seek additional information in advance of rejecting [plaintiff's] claim." Rosa, 168 F.3d at 79 n.5 (citation and quotation marks omitted).

The cases plaintiff relies on to support her argument are unpersuasive in the context of this case. For example, plaintiff cites Guillen v. Berryhill, 697 F. App'x 107 (2d Cir. 2017). In Guillen, the court found

> the medical records obtained by the ALJ do not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen. The medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life.

Id. at 108-09. The court remanded the matter and, inter alia, directed the Commissioner to "request a medical source statement

from Guillen's treating physician, including an assessment of Guillen's limitations vis-à-vis her ability to work[.]" Id. at 109.

Guillen is readily distinguishable. First, the record here contains six medical source opinions that specifically shed "light on [plaintiff's] residual functional capacity[.]" Compare id. at 108; with Tr. 202-20; 222-38; 802-05; 807-10. Second, two of the consulting doctors in this case, Dr. Underhill and Dr. Kogan, did "personally evaluate" plaintiff. Compare Guillen, 697 F. App'x at 109; with Tr. 802-05; 807-10. Third, the record as a whole — including the six medical source statements, the treatment notes and records from plaintiff's treating clinicians, and plaintiff's own statements — does provide "insight into how [plaintiff's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." Compare Guillen, 697 F. App'x at 109; with, e.g., Tr. 178-84 (plaintiff's testimony regarding her daily activities, including her ability to attend yoga classes, go to the movies, and travel to Hawaii and Florida).

In sum, the Commissioner satisfied any duty he had to request medical source opinions from plaintiff's treating physicians and providers, including the Susan B. Anthony Project. Moreover, even if the Commissioner had improperly failed to request such opinions and records, the record contains

sufficient evidence to support the ALJ's RFC determination.
Therefore, remand is not required. See Tankisi, 521 F. App'x at
34.

    2.    *Failure to Consider "Additional Written Evidence"*

Plaintiff appears to argue that the ALJ erred because he
did not discuss "additional written evidence" submitted by
plaintiff just prior to the administrative hearing. Doc. #18-2
at 8. The ALJ's decision stated:

> The claimant submitted or informed the Administrative
> Law Judge about additional written evidence less than
> five business days before the scheduled hearing date.
> Neither the claimant, nor her representative submitted
> a good cause statement or other evidence explaining the
> reason for the delay in submission of such evidence or
> why it was submitted untimely. Therefore, the
> undersigned Administrative Law Judge declines to admit
> this evidence because the requirements of 20 CFR
> 404.935(b) are not met.

Tr. 11. As to this evidence, plaintiff asserts:

> No one involved in the instant matter — not the
> undersigned, not the Commissioner's counsel, and
> assuredly not the Court — has the slightest idea as to
> what this "additional written evidence" is or might be.
> The Administrative Record is facially incomplete. The
> issue was not discussed at the hearing, and the ALJ's
> decision is silent as to the content of the "additional
> written evidence" that he has refused to admit into
> evidence. ... The Court should not be required to play
> guessing games in this (or any other) context.

Doc. #18-2 at 8. While plaintiff argues that the "Administrative
Record is facially incomplete[]" because it does not contain
this written evidence, id., the record does include a
"Prehearing Memorandum," submitted by plaintiff on August 29,

2018, just one day before the administrative hearing. See Tr. 46-53.

In addition, while plaintiff alleges that "[t]he issue" of the purported missing evidence "was not discussed at the hearing," Doc. #18-2 at 8, the transcript of the administrative hearing indicates otherwise. See Tr. 163. Indeed, the ALJ asked plaintiff's counsel if he "had an opportunity to review the file for this case[.]"[7] Tr. 163. Counsel responded that he had, and that he had no "objections to the documents in the electronic file being admitted into the record[.]" Tr. 163. The ALJ then asked counsel if he had "any further documents to discuss or present at this time[,]" to which plaintiff's counsel responded: "No, Your Honor." Tr. 163. Therefore, far from failing to discuss the issue of any additional evidence at the hearing, the ALJ specifically asked counsel whether he wished to present "any further documents" and counsel declined to do so. Tr. 163.

Moreover, plaintiff does not argue that the ALJ's consideration of the prehearing memorandum — or any other "additional written evidence" — would have changed the outcome of the hearing. Doc. #18-2 at 8. "When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is

---

[7] Plaintiff was represented by a different attorney, Paul Daddario, at the administrative hearing. See Tr. 161.

significant, and plaintiff bears the burden of establishing such harmful error." Parker, 2015 WL 928299, at *12 (citation and quotation marks omitted). Plaintiff has not attempted to establish how this purportedly "missing evidence is significant[]" or how the ALJ's refusal to consider it constitutes "harmful error." Id. Accordingly, remand is not warranted on this basis.

     C.    <u>Evaluation of the Opinion Evidence</u>

Plaintiff argues that the ALJ erred by giving great weight to the medical opinions of Dr. Jeanne Kuslis and Dr. Taurun Ray. See Doc. #18-2 at 13. Neither Dr. Kuslis nor Dr. Ray examined plaintiff; each offered an opinion after review of plaintiff's medical records. See Tr. 21. The Court finds that the ALJ did not err in according great weight to the opinions of Dr. Kuslis and Dr. Ray.

     1.    *Applicable Law*

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [plaintiff's] impairment(s), including [plaintiff's] symptoms, diagnosis and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff's] physical or mental restrictions." 20 C.F.R. §404.1527.

> When weighing any medical opinion, treating or otherwise, the Regulations require that the ALJ consider the following factors: length of treatment relationship;

> frequency of examination; nature and extent of the
> treatment relationship; relevant evidence used to
> support the opinion; consistency of the opinion with the
> entire record; and the expertise and specialized
> knowledge of the treating source.

Poole, 462 F. Supp. 3d at 150. Courts in the Second Circuit do

not require a "slavish recitation of each and every factor where

the ALJ's reasoning and adherence to the regulation are clear."

Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).

"It is well-settled that a consulting physician's opinion

can constitute substantial evidence supporting an ALJ's

conclusions." Mayor v. Colvin, No. 1:15CV00344(AJP), 2015 WL

9166119, at *18 (S.D.N.Y. Dec. 17, 2015); see also Zamfino v.

Saul, No. 3:18CV01925(RMS), 2019 WL 3729547, at *6 (D. Conn.

Aug. 8, 2019) ("[R]eliance on the[] findings [of consultative

physicians] is appropriate when they are supported by

substantial evidence in the record[.]" (citation and quotation

marks omitted)); Monroe v. Comm'r of Soc. Sec.,

5:15CV01235(GTS)(WBC) 2016 WL 7971330, at *8 (N.D.N.Y. Dec. 29,

2016) ("[T]he Second Circuit has made it clear that the opinions

of State agency medical consultants ... may constitute

substantial evidence to support an ALJ's RFC determination[.]").

### 2. Dr. Kuslis

First, plaintiff argues that the ALJ erred in according

great weight to Dr. Kuslis' opinion. See Doc. #18-2 at 13. The

ALJ stated:

> The undersigned gives great weight to the opinion by
> Jeanne Kuslis, M.D., signed on April 19, 2017 who found
> that the claimant is capable of light exertion (Exhibit
> 1A). These findings are consistent with the results from
> the consultative examination showing a normal
> examination (Exhibits 11F, 12F).

Tr. 21. The consultative examinations referenced were conducted

by Dr. Underhill and Dr. Kogan. See Tr. 802, 807. Plaintiff

asserts that "it is impossible to read Dr. Underhill's

evaluation ... as 'normal[,]'" and that "[i]t is only slightly

more possible to read Dr. Kogan's report ... as 'normal.'" Doc.

#18-2 at 13. Plaintiff argues that because these examinations

were not "normal," the ALJ erred in crediting Dr. Kuslis'

opinion that plaintiff was capable of light exertion based on

its consistency with their findings. See id.

Dr. Underhill conducted a psychological examination of

plaintiff on March 3, 2017. See Tr. 802. As such, Dr.

Underhill's findings, which focus on plaintiff's mental health,

are largely irrelevant to Dr. Kuslis' opinion that plaintiff is

capable of light exertion. See id. However, Dr. Underhill

observed: "[Plaintiff] is a moderately tall, mildly overweight,

52-year-old, divorced female, who was neatly attired and

groomed. There was no evidence of disturbance in gait, posture,

or motor movements." Tr. 802. The only logical inference is that

the ALJ relied on this portion of Dr. Underhill's report in

finding it supported Dr. Kuslis' opinion.

Dr. Kogan conducted a physical examination of plaintiff on March 28, 2017. See Tr. 807. Dr. Kogan's findings appear largely unremarkable; for example, he found that plaintiff had no abnormal respiratory symptoms, and that her extremities had "[n]o clubbing, cyanosis, or edema." Tr. 809. During the examination, plaintiff "report[ed] tenderness to palpation involving the entire posterior torso[.]" Tr. 809. Dr. Kogan determined: "There is no synovitis involving any of the joints of the upper and lower extremities bilaterally." Tr. 809. Dr. Kogan found "[t]here is full range of motion at the cervical spine, lumbar spine and throughout all the joints of the upper and lower extremities bilaterally." Tr. 809. The report states that plaintiff's motor "strength is 5/5[,]" that her "fine finger movements are normal[,]" and that her gait is "[n]ormal[.]" Tr. 809. Regarding plaintiff's functional abilities, Dr. Kogan opined:

> On current examination there are no range of motion deficits and no neurological deficits that limit sitting, standing, walking, bending, lifting, carrying, reaching or finger manipulations. The above activities are mildly limited due to generalized musculoskeletal pain.

Tr. 809.

The ALJ did not err when he characterized Dr. Underhill and Dr. Kogan's examinations as "normal[.]" Tr. 21. Dr. Kuslis' conclusion that plaintiff was capable of light exertion is

consistent with Dr. Underhill's observations and Dr. Kogan's findings. Accordingly, the ALJ did not err by giving great weight to Dr. Kuslis' opinion based on its consistency with Dr. Underhill and Dr. Kogan's evaluations. See Tr. 21.

Further, "an ALJ can afford great weight to a consulting physician's report if it is consistent with the record as a whole." Ayala v. Comm'r of Soc. Sec. Admin., No. 7:18CV00124 (VB), 2019 WL 1417220, at *1 (S.D.N.Y. Mar. 29, 2019). Here, Dr. Kuslis' opinion that plaintiff is capable of light exertion is consistent with the record. See, e.g., Tr. 133 (treatment notes stating plaintiff "does not require or need assistance to rise from a chair ... does not require or need assistance to walk and get around[]"); Tr. 135 (physical examination finding "[m]usculoskeletal system: normal. Normal movement of all extremities[]"); Tr. 521 (plaintiff "[c]an last 15 minutes to 1 hour[]" on a treadmill with "[n]o wheezing[]"); Tr. 592 (plaintiff "feels great during her yoga class[]"); Tr. 598 (plaintiff "feels better after doing the yoga and elieptical[]" (sic)). Plaintiff testified that she could "lift or carry" "ten pounds maybe[,]" Tr. 176, that she performs "[l]ight housework[,]" including doing the dishes and "fold[ing] some clothes[,]" Tr. 177, and that she regularly attended yoga classes, see Tr. 178, walked on the treadmill, see Tr. 178, and traveled by plane to Florida and Hawaii, see Tr. 181-83.

Finally, plaintiff has not articulated how the ALJ's assignment of great weight to Dr. Kuslis' opinion affected the outcome of the decision. Indeed, Dr. Kuslis' opinion supported an RFC that was <u>less</u> restrictive than the one adopted by the ALJ. While Dr. Kuslis concluded that plaintiff could frequently climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl, <u>see</u> Tr. 215, the ALJ determined that plaintiff could only "occasionally" do these things. Tr. 17. Therefore, despite giving Dr. Kuslis' opinion great weight, the ALJ declined to adopt several of her recommendations regarding plaintiff's physical limitations, opting instead to impose a more restrictive RFC. Dr. Kuslis' opinion that plaintiff is capable of light exertion is supported by the record, and the ALJ did not err by giving it great weight.

### 3. Dr. Ray

Second, plaintiff argues that the ALJ erred by giving great weight to Dr. Ray's opinion. <u>See</u> Doc. #18-2 at 13. The ALJ stated:

> The undersigned gives great weight to the [opinion of the] medical consultant, Taurun Ray M.D., signed June 2, 2017 (Exhibit 3A). The undersigned gives his opinion great weight based on the light exertion and occasional postural exertions, except unlimited balance and avoidance of concentrated exposure to dust.[8]

---

[8] While the ALJ's opinion stated that the ALJ did not give Dr. Ray's opinion great weight as to his finding that plaintiff should "[a]void concentrated exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc.[,]" Tr. 234, the ALJ's RFC

Tr. 21. Plaintiff devotes just two sentences to Dr. Ray's opinion in her brief, asserting in a conclusory manner that the ALJ's "stated reason for giving Dr. Ray's opinion 'great weight' ... is not a 'reason.'" Doc. #18-2 at 13.

The Court disagrees. The ALJ's decision to accord Dr. Ray's opinion great weight "based on the light exertion and occasional postural exertions," Tr. 21, is logically construed as giving the opinion great weight because it is "consistent with the record as a whole." Ayala, 2019 WL 1417220, at *1. Dr. Ray's opinion that plaintiff is capable of light exertion and occasional postural exertions is consistent with the opinions of Dr. Kuslis, see Tr. 215-16, and Dr. Kogan, see Tr. 809-10, the observations of Dr. Underhill, see Tr. 802, treatment notes from plaintiff's treating clinicians, see Tr. 133, 135, 521, 598, and plaintiff's own testimony, see Tr. 178, 181-83. Therefore, the ALJ did not err in according the opinion great weight.

In sum, the ALJ did not err in according great weight to the medical opinions of Dr. Kuslis and Dr. Ray, because each was consistent with the medical evidence and testimony in the record.

---

stated that plaintiff "must avoid concentrated exposure to dust, odors, fumes and pulmonary irritants." Tr. 17.

D.   Evaluation of Plaintiff's Fibromyalgia and Pain

Plaintiff argues that the ALJ failed to adequately evaluate her fibromyalgia and related pain. See Doc. #18-2 at 14-20. First, plaintiff asserts that the ALJ erred by "requiring objective evidence for fibromyalgia — a disease that eludes such measurement." Id. at 15. Second, plaintiff contends that "the ALJ's failure to account in an adequate manner for h[er] chronic, intractable pain was highly prejudicial error." Id. at 18. Because the Court finds that the ALJ properly evaluated plaintiff's fibromyalgia and related pain based on all of the evidence presented, the ALJ committed no error.

1.   Fibromyalgia

Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2P, 2012 WL 3104869 at *2 (S.S.A. July 25, 2012). The ALJ determined that plaintiff's fibromyalgia is a severe impairment. See Tr. 14. Despite this, the ALJ found "that the claimant remains capable of performing work consistent with the limited range of light exertion, with additional limitations[.]" Tr. 18.

Plaintiff contends that the ALJ erroneously evaluated her fibromyalgia based only on objective medical evidence. See Doc. #18-2 at 15. In support of this argument, plaintiff quotes one passage of the ALJ's decision:

47

> The claimant has a history of asthma, fibromyalgia, and obesity. In evaluating the claimant's subjective complaints, the undersigned credits only those complaints that diminish the claimant's capacity for basic work activities <u>only to the extent they are reasonably consistent with the objective evidence of record</u>. While the claimant's physical impairments limit her overall level of functioning, the <u>objective medical evidence does not establish that these impairments are disabling</u> ... Overall, the undersigned finds that these mild to minimal findings on objective clinical testing are not consistent with the claimant's allegations of ongoing and disabling symptoms.

<u>Id.</u> at 14 (quoting Tr. 18, emphasis added by plaintiff).

Plaintiff contends that this language shows that the ALJ "effectively required 'objective' evidence for a disease that eludes such measurement." <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 108 (2d Cir. 2003). The Court disagrees.

SSR 12-2p provides guidance on how the Commissioner evaluates fibromyalgia in disability claims. <u>See</u> SSR 12-2P, 2012 WL 3104869. In relevant part, the ruling states:

> Once an MDI is established, we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate the symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

SSR 12-2P, 2012 WL 3104869 at *5. "Objective medical evidence is
evidence obtained from the application of medically acceptable
clinical and laboratory diagnostic techniques, such as evidence
of reduced joint motion, muscle spasm, sensory deficit or motor
disruption." 20 C.F.R. §404.1529(c)(2). In fibromyalgia cases,
if the objective medical evidence is inconsistent with
plaintiff's testimony regarding her functional limitations, the
ALJ will "consider all of the evidence in the case record[.]"
SSR 12-2P, 2012 WL 3104869 at *5; see also Anysha M. v. Comm'r
of Soc. Sec., No. 3:19CV00271(CFH), 2020 WL 1955326, at *3
(N.D.N.Y. Apr. 23, 2020) ("When determining an RFC based on
fibromyalgia, the ALJ is not entitled to rely solely on
objective evidence -- or lack thereof -- related to
fibromyalgia, but must consider all relevant evidence, including
the longitudinal treatment record.").

Plaintiff's reliance on Green-Younger for the premise that
the ALJ erred by "effectively requir[ing] 'objective' evidence
for a disease that eludes such measurement[,]" is misplaced.
Green-Younger, 335 F.3d at 108. The central issue in Green-
Younger was whether the ALJ erred by refusing to credit the
opinion of the plaintiff's treating physician, who diagnosed her
with fibromyalgia and opined that the limitations caused by her
fibromyalgia prevented her from working. See id. at 106-08. The
ALJ in Green-Younger "did not actually credit [the treating

physician's] diagnosis of fibromyalgia or misunderstood its nature." Id. at 108. In this case, by contrast, the ALJ determined that plaintiff's fibromyalgia is a severe impairment. See Tr. 14. Further, while the Court in Green-Younger found that the ALJ's decision inappropriately "turned on a perceived lack of objective evidence[,]" Green-Younger, 335 F.3d at 108, here, as will be discussed more fully below, the ALJ evaluated plaintiff's fibromyalgia based on more than the objective medical evidence presented. See Tr. 18-20. For these reasons, Green-Younger is readily distinguishable. See Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) ("While we recognize that fibromyalgia is a disease that eludes objective measurement, mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability[.]" (citation and quotations omitted)).

Furthermore, the 2003 decision in Green-Younger predates SSR 12-2p, which was issued in 2012. See SSR 12-2P, 2012 WL 3104869 at *1. Indeed, SSR 12-2p appears to respond to, and address, the concerns raised by the Court in Green-Younger about the inherent difficulties that arise when evaluating fibromyalgia. See id. at *5. SSR 12-2p acknowledges that fibromyalgia patients' subjective complaints may be unsubstantiated by the objective medical evidence. See id. In such cases, the ALJ is instructed to look beyond the objective

medical evidence and "consider all of the evidence in the case record[.]" Id. Accordingly, the pertinent question before the Court is whether the ALJ adhered to SSR 12-2p in evaluating plaintiff's fibromyalgia.

The ALJ followed the steps set forth in SSR 12-2p, and committed no error. First, the ALJ found that plaintiff's fibromyalgia is a severe impairment. See Tr. 14. The ALJ next considered the objective medical evidence, and concluded that "[t]he medical evidence of record does not support the claimant's allegations of ongoing and disabling symptoms." Tr. 19. The ALJ determined: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 18. Because the objective medical evidence "d[id] not substantiate [plaintiff's] statements" about the functional limitations caused by her fibromyalgia, the ALJ went on to "consider all of the evidence in the case record[.]" SSR 12-2P, 2012 WL 3104869 at *5.

The ALJ considered plaintiff's "daily activities[.]" Id. The ALJ noted that plaintiff's activities, including traveling, going to the movies, attending yoga classes, and exercising at the gym, "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Tr. 20. The ALJ also found that "[d]espite allegations of significant

limitations, the claimant maintains her personal care and personal hygiene, such as dressing and bathing. Indeed, these self-described activities indicate the claimant functions at a higher level physically ... than alleged." Tr. 20 (citation omitted). The ALJ concluded that plaintiff's "subjective reports are highly probative and are not consistent with her allegation of ongoing and disabling symptoms." Tr. 19. That is, the ALJ determined that plaintiff's claims regarding the severity of her symptoms were unsupported not only by the objective medical evidence, but also by her own testimony.

The ALJ also considered "the medications or other treatments [plaintiff] uses ... to alleviate the symptoms[.]" SSR 12-2P, 2012 WL 3104869 at *5. He noted that plaintiff "has treated her pain with conservative treatment measures, such as exercise and medication, which have been effective in controlling her symptoms[.]" Tr. 19. The ALJ found that plaintiff "has been stable on Cymbalta," and noted that in December 2017, plaintiff "reported her fibromyalgia continues to remain stable[.]" Tr. 19.

In sum, the ALJ followed the steps set forth in SSR 12-2p. In so doing, he properly considered more than just the objective medical evidence. While plaintiff points to just one paragraph to support her position, the ALJ discussed plaintiff's fibromyalgia throughout his decision. See Tr. 15, 17, 18, 19,

52

20, 21. The ALJ committed no error. See Anysha, 2020 WL 1955326, at *5 ("The ALJ's references to fibromyalgia and chronic widespread pain throughout her RFC analysis indicate that she properly considered Plaintiff's fibromyalgia in determining Plaintiff's physical limitations that are supported by the evidence of record."); see also Burgos v. Astrue, No. 3:09CV01216(VLB), 2010 WL 3829108, at *1 (D. Conn. Sept. 22, 2010) (finding no error where the ALJ found Plaintiff not disabled because her allegations regarding the disabling effects of her fibromyalgia "were not supported by the objective medical evidence, her course of treatment, her medications, the medical opinions in the record, her daily living, her work history, and the overall inconsistencies in the record[]").

> ## 2.   Pain

Plaintiff also argues that the ALJ failed to adequately consider or credit her reports of chronic pain, constituting "highly prejudicial error." Doc. #18-2 at 18. Plaintiff contends that "[t]he ALJ has swept away [plaintiff's] claims of chronic pain[,]" and made "an adverse credibility finding using different words." Id. at 17.

When a claimant suffers from fibromyalgia, an ALJ is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." Rivers, 280 F. App'x at 22.

> If the claimant's testimony concerning the intensity,
> persistence or functional limitations associated with
> his or her pain is not fully supported by clinical
> evidence ... then the ALJ must consider additional
> factors in order to assess that testimony, including: 1)
> daily activities; 2) location, duration, frequency and
> intensity of any symptoms; 3) precipitating and
> aggravating factors; 4) type, dosage, effectiveness and
> side effects of any medications taken; 5) other
> treatment received; and 6) other measures taken to
> relieve symptoms.

Crysler v. Astrue, 563 F. Supp. 2d 418, 440 (N.D.N.Y. 2008); see

also Burgos, 2010 WL 3829108, at *2 (The ALJ "did not misapply

the relevant legal standards" when "contrary to the Plaintiff's

argument, the ALJ did consider the pain associated with the

Plaintiff's fibromyalgia. The ALJ noted the Plaintiff's report

that she suffered chronic pain, discussed her activities of

living and response to medication, and found that no treating or

examining physician had imposed any greater work restrictions

than those included in the RFC determination."). Remand is not

required where "the ALJ's decision to discount [plaintiff's]

claims of pain was sufficiently clear and is supported by

substantial evidence in the record[.]" Graf v. Berryhill, No.

3:18CV00093 (SRU), 2019 WL 1237105, at *8 (D. Conn. Mar. 18,

2019).

The ALJ considered plaintiff's reports of pain throughout

his decision. See Tr. 17 ("[T]he claimant testified she

experiences generalized body pain, fatigue and weakness[.]");

Tr. 18 (twice noting plaintiff's assertions of "generalized body

54

pain"); Tr. 19 (discussing the medications and other methods plaintiff has used to "treat[] her pain"). Moreover, the ALJ considered plaintiff's daily activities, and noted that they were inconsistent with plaintiff's reports of pain. See Tr. 20 (discussing plaintiff's daily activities, and finding they "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations[]"). The ALJ also discussed plaintiff's treatment, observing that plaintiff "has treated her pain with conservative treatment measures, such as exercise and medication, which have been effective in controlling her symptoms[.]" Tr. 19.

Significantly, although the ALJ ultimately determined that plaintiff is not disabled, the ALJ's decision indicates that he did find plaintiff's reports of pain credible, in large part. The ALJ gave only partial weight to the opinion of Dr. Kogan, who conducted a physical examination of plaintiff, "because the limitations opined by this doctor are somewhat vague and do not properly account for claimant's pain from her fibromyalgia[.]" Tr. 21 (emphasis added). Therefore, not only did the ALJ consider plaintiff's reports of pain, he actually credited her reports over the findings of an examining physician. See Tr. 21. The Court finds that the ALJ did not err in evaluating plaintiff's chronic pain, because his reasoning is "sufficiently

clear and is supported by substantial evidence in the record[.]"
Graf, 2019 WL 1237105, at *8.

    E.    The RFC Determination

    Finally, plaintiff argues: "The ALJ'S Step Five Findings
Are Not Supported by Substantial Evidence[.]" Doc. #18-2 at 20.
This section of the brief, however, does not actually challenge
the ALJ's step five finding. Rather, plaintiff argues that the
RFC fails to account for all of plaintiff's postural,
environmental, and social limitations. See id. at 23. Therefore,
plaintiff asserts, the ALJ's hypothetical question to the VE was
"defective." Id. at 22. Because the Court finds that the ALJ's
RFC is supported by substantial evidence, and the hypothetical
question matched the RFC, the ALJ committed no error.

    "An ALJ may rely on a vocational expert's testimony
regarding a hypothetical as long as there is substantial record
evidence to support the assumptions upon which the vocational
expert based his opinion, and accurately reflect the limitations
and capabilities of the claimant involved[.]" McIntyre v.
Colvin, 758 F.3d 146, 151 (2d Cir. 2014) (citations and
quotation marks omitted). Here, The ALJ posed the following
hypothetical to the VE:

        Suppose  you  had  a  hypothetical  person  same  age,
        education,  experience  as  the  Claimant.  Okay?  And  that
        hypothetical  person  could  perform  their  work  at  the
        light  exertional  level.  Further,  the  hypothetical  person
        could  occasionally  climb  ramps  and  stairs,  occasionally

climb ladders, ropes, and scaffolds, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. Further, the hypothetical person must avoid concentrated exposure to dust, odors, fumes, and other pulmonary irritants. Further, the hypothetical person cannot work at unprotected heights. Further, the hypothetical person can tolerate occasional interaction with the public and occasional interaction with coworkers. And then further the hypothetical person could tolerate occasional changes in their work setting and work procedures, which are simple and routine in nature.

Tr. 194-95. This hypothetical closely tracks the RFC. See Tr. 17. Therefore, plaintiff's argument that the hypothetical question was "defective[]" is actually an argument that the ALJ's RFC determination was flawed. Doc. #18-2 at 22. The Court disagrees.

The question before the Court is not "whether there is substantial evidence supporting the appellant's view[,]" but "whether substantial evidence supports the ALJ's decision." Bonet, 523 F. App'x at 59. Residual functional capacity "is what the claimant can still do despite the limitations imposed by [her] impairment." Greek v. Colvin, 802 F.3d 370, 374 n.2 (2d Cir. 2015); see also 20 C.F.R. §404.1545(a)(1). The RFC is determined "based on all the relevant evidence in [the] case record[,]" including "all of the relevant medical and other evidence." 20 C.F.R. §§404.1545(a)(1), (3).

Plaintiff first asserts that the ALJ's determination "that in spite of her fibromyalgia, asthma, and obesity, Ms. [R.]

could climb ladders, ropes, scaffolds, stairs, and ramps up to
one-third of a work day" was based upon "no discernible evidence
whatsoever[.]" Doc. #18-2 at 23. In fact, the ALJ's
determination was based on substantial evidence. For example, as
discussed, Dr. Kogan conducted a physical examination of
plaintiff and concluded that "there are no range of motion
deficits and no neurological deficits that limit sitting,
standing, walking, bending, lifting, carrying, reaching or
finger manipulations." Tr. 809. Additionally, Dr. Ray found that
plaintiff could occasionally climb ramps, stairs, ladders,
ropes, and scaffolds, see Tr. 233, and Dr. Kuslis opined that
plaintiff could frequently climb ramps, stairs, ladders, ropes,
and scaffolds, see Tr. 215. Moreover, plaintiff's descriptions
of her activities, including attending yoga classes and walking
on the treadmill, provide support for the ALJ's finding. See Tr.
178-79.

Next, plaintiff seems to contest the environmental
limitations included in the RFC. Plaintiff states that the ALJ
"found that Ms. [R.] 'must avoid concentrated exposure to dust,
odors, fumes, and other pulmonary irritants[.]'" Doc. #18-2 at
23 (quoting Tr. 17, emphasis added by plaintiff). While
plaintiff makes no explicit argument as to why this limitation
is flawed, in a footnote she directs the Court to a letter
submitted by counsel to the Appeals Council on December 24,

2018. See Doc. #18-2 at 23 n.52; citing Tr. 436-37. That letter
states: "ALJ offered an RFC with no 'concentrated exposure' to
respiratory irritants. The issue here is that it creates an
unaddressed conflict with the DOT and companion publication, the
SCO." Tr. 436. The letter argues that in the SCO, atmospheric
conditions, including respiratory irritants, "are measured using
a scale of Not Present, Occasional, Frequent, and Constant[]"
rather than by concentration. Tr. 437. The letter further
asserts that "[e]ven if the ALJ had described the respiratory
irritant exposure to the [VE] as occasional, it could
potentially mean that for 1/3 of the work day the claimant would
be exposed to irritants that could cause an acute pulmonary
inflation and respiratory distress, which would obviously
preclude employment at that RFC." Tr. 437.

     The Court notes that plaintiff has not actually made these
arguments in her brief. However, even assuming that plaintiff
intends to incorporate the arguments set forth in the letter,
and that such "argument by reference" is permissible, the Court
does not find them persuasive. First, while plaintiff asserts
that the RFC and question posed to the VE are flawed because
they "limit[] the claimant's exposure to respiratory irritants
based on concentration rather than by time/percentage of a work
day[,]" Tr. 437, plaintiff's counsel raised no objection to the

hypothetical on this basis at the administrative hearing. See 198-200.

Second, the ALJ's language is drawn directly from the medical opinions provided by Dr. Kuslis and Dr. Ray; each specifically opined that plaintiff should "[a]void concentrated exposure" to fumes, odors, dusts, gases, and poor ventilation. Tr. 216, 234. Courts in this Circuit have affirmed RFCs containing similar language. See, e.g., Poole, 462 F. Supp. 3d at 161 ("[S]ubstantial evidence supports the ALJ's RFC determination" that plaintiff "should avoid concentrated exposures to respiratory irritants such as dusts, fumes, gases, etc." (quotation marks omitted)); Cassandra H. v. Comm'r of Soc. Sec., No. 8:19CV00226(ATB), 2020 WL 1169404, at *14 (N.D.N.Y. Mar. 10, 2020) (affirming the Commissioner's decision where "the ALJ found that plaintiff should avoid concentrated exposure to extremes of heat and cold and pulmonary irritants such as fumes, odors, dust, and gases[]" (citation and quotation marks omitted) (emphasis in original)); Dziamalek v. Saul, No. 3:18CV00287 (SRU), 2019 WL 4144718, at *19 (D. Conn. Sept. 3, 2019) (RFC finding plaintiff "must avoid concentrated exposure to pulmonary irritants[]" was "consistent with the record").

Third, "even if the ALJ had described the respiratory irritant exposure to the [VE] as occasional," Tr. 437, which plaintiff contends would be the proper phrasing, such a

limitation would be supported by substantial evidence. See, e.g., Tr. 136 (treatment note indicating plaintiff rated her "asthma control during the past 4 weeks[]" as "[c]ompletely controlled[]"); Tr. 234 (medical source statement finding plaintiff's "[a]sthma is well controlled on inhalers[]"); Tr. 471 (treatment note stating that plaintiff "is doing well with her asthma treatment"); Tr. 472 (treatment note stating that plaintiff's "respiratory status remains reasonably stable ... [s]he denies chest tightness or wheezing[]"); Tr. 809-10 (medical source statement noting "[c]urrent pulmonary exam findings are normal" and concluding "[w]ork related activities involving exertion are mildly limited due to asthma[]"). Accordingly, the ALJ did not err with regard to the RFC's environmental limitations.

Finally, plaintiff appears to contend that the ALJ erred by "conclud[ing] that [plaintiff] can interact with the general public and coworkers for up to one third of a work day" even though plaintiff "has a 'Social Anxiety Disorder' as a severe impairment[.]"[9] Doc. #18-2 at 23. Again, plaintiff does not

_____

[9] Plaintiff also raises the issue of her mental health in one paragraph on pages nineteen and twenty of her brief. See Doc. #18-2 at 19-20. Plaintiff writes: "It is of more than passing interest to note that the ALJ took pains to state that a 'record in January 2016 shows that her counseling sessions were terminated.' The ALJ appears to have neglected to note that the very same document reflected forty treatment sessions between December of 2014 and January of 2016 (all during the period at

articulate how the ALJ erred in this respect. Regardless, the Court finds that the ALJ's RFC as to plaintiff's social limitations is supported by substantial evidence.

Both Dr. Bangs and Dr. Fadakar determined that plaintiff's "ability to interact appropriately with the general public[]" and to "get along with coworkers" was "[m]oderately limited[.]" Tr. 217, 235. Dr. Underhill, who conducted a psychological evaluation of plaintiff, concluded that plaintiff "appears able to relate appropriately with coworkers and supervisors." Tr. 805. Further, treatment notes from LCSW Sirignano indicate that plaintiff's anxiety was improving with treatment. See, e.g., Tr. 894 ("Christine feels there has been continued movement, she is taking more appropriate risks in social situations, and she is feeling empowered."); Tr. 895 ("Christine notes many positive changes in relation to her anxiety[.]"); Tr. 908 ("Christine continues to improve but did have some anxiety emerge over a situation with her daughter[.]"); Tr. 915 (Plaintiff "reports improved level of confidence so far and a reduction in distress related to trauma memory, from an 8/10 to a 3/10."). Finally,

---

issue before him), none of which he sought records for." Id. at 19. Plaintiff has not made any particular argument as to how this alleged failure constituted reversible error. Moreover, plaintiff's assertion that no records were sought for those treatment sessions is untrue; as has been noted repeatedly, records were requested from the Susan B. Anthony Project, which refused to provide them. See Tr. 158.

plaintiff's testimony regarding her activities, which included going to the movies, traveling, visiting Disney World, attending yoga classes, and exercising at the gym, see 178-84, supports the ALJ's finding that she can "tolerate occasional interaction with the public and co-workers." Tr. 17.

In sum, substantial evidence supports the ALF's RFC determination. Because the ALJ's hypothetical closely tracked the RFC, the ALJ committed no error at Step Five.

**VI.  CONCLUSION**

For the reasons set forth herein, plaintiff's Motion to Reverse the Decision of the Commissioner [**Doc. #18**] is **DENIED,** and defendant's Motion for an Order Affirming the Commissioner's Decision [**Doc. #20**] is **GRANTED**.

SO ORDERED at New Haven, Connecticut, this 14th day of January, 2021.

/s/
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE